# SHERMAN *v.* UNITED STATES.

## APPEAL FROM THE COURT OF CLAIMS.

No. 664. Submitted December 18, 1894. — Decided January 14, 1895.

A chief supervisor of elections, appointed under the provision of Rev. Stat. § 2025, is not required by law to make copies of the lists of registered voters returned to him, nor to arrange them in alphabetical order after filing them, and is not authorized to charge the United States for such services voluntarily performed.

THIS was a petition of the chief supervisor of elections for the Northern District of Illinois, for "services rendered as such chief supervisor, in entering and indexing the records of his office, to wit: The records of the names of persons who registered and voted at the election held in the city of Chicago, city of Lake View, town of Lake, and village of Hyde Park, in November, 1888, at which election Representatives to Congress were voted for, 61,482 folios, at 15 cents per folio, amounting to $9222.30," and for disbursements made in connection therewith amounting to $210.35.

The Court of Claims, upon the evidence, found the facts to be as follows:

1. Claimant, Elijah B. Sherman, has been a commissioner of the United States and chief supervisor of elections for the Northern District of Illinois since the year 1884, duly qualified, and is still acting as such.

2. In connection with the Congressional election of 1888 he performed the duties of chief supervisor of elections under the provisions of title 26 of the Revised Statutes of the United States, known as "the elective franchise," in addition to the duties of Circuit Court commissioner.

3. On or about the 25th day of July, 1892, the claimant made and duly verified an account for certain services and disbursements as chief supervisor of elections in connection with the Congressional election of 1888, to wit, for entering and indexing the records of persons registered and of voters, being the records of the chief supervisor's offices 61,482 folio, at 15 cents per folio, $9222.30, and for disbursements amounting to $210.35.

4. Said account was duly presented in open court in the Circuit Court of the United States for said district in the presence of the District Attorney of the United States for said district; said court entered an order finding that said account was correct as to the number of folios embraced therein, and that the item for stationery and supplies necessarily used in making said record was correct, but declining to approve said account or certify the correctness thereof for the reason that said Circuit Judge thought the statute did not authorize the work charged for by the chief supervisor.

5. No part of the work done, disbursements made, or services referred to and charged for in the aforesaid account has been included in, covered by, or embraced in any account made or presented to the accounting officers of the Treasury or any other department or office of the United States other than the account sued upon herein, and no payment has been made for any item charged therein, and all of said service was performed within six years before the commencement of this suit.

6. Said account was presented to the accounting officers of the United States Treasury Department for payment and payment thereof was refused; thereupon the First Auditor of the Treasury, on the ground that said claim involved a controverted question of law, certified said claim to the honorable Secretary of the Treasury and transmitted the same to him, together with all the vouchers, papers, documents, and proofs pertaining thereto, that the same might be transmitted to the Court of Claims, as provided in section 1063, Revised Statutes; and thereupon the honorable acting Secretary of the Treasury transmitted to this court the claim of petitioner, with all vouchers, papers, proofs, and documents pertaining thereto, to be proceeded with in this court according to law.

7. The claimant, as chief supervisor of elections, required of supervisors of elections lists of the persons who registered and voted in their respective election districts or voting precincts at said election held in November, 1888 ; such lists when made were returned to and filed by him and became a part of the records of his office; said lists were necessary for properly guarding and scrutinizing said election and the registration prior thereto.

8. The nature of the services described in the account in suit was the entering and indexing of the records of persons who registered for the purpose of voting at the election for Representatives in Congress held in November, 1888, in the city of Chicago, city of Lake View, village of Hyde Park, and town of Lake, in said Northern District of Illinois, and said index record contained the particulars relative to each voter then required by the laws of the State of Illinois, and

as shown in Exhibit "A." The matter contained in said index record was contained in the registers or lists made by supervisors of election, and returned to claimant as chief supervisor of elections, and which became part of the records of his office.

9. The disbursements charged for are for large index volumes for entering and indexing the records of the claimant's office and for stationery and supplies necessarily used in and about the entering and indexing of said records, amounting to $210.35.

10. Before the services now sued for were performed the claimant made out and presented his account as chief supervisor of elections for services rendered at the Congressional election of 1888, in which account, and while it was in the possession of the First Comptroller, and before it was approved by him, the claimant endorsed the following words :

"The foregoing account and claim against the government is presented without prejudice to my right to present hereafter a further account and claim for the services in entering and indexing the records of my said office touching the said election of 1888 and the registration prior thereto and for any other services rendered by me in connection with said election which is not included in the foregoing account and without prejudice to the right to sue therefor."

The index so prepared of the election of 1888 was not in fact made until after the Congressional election of 1890. It was used by the claimant in the election of 1892, but to what extent does not appear. The similar index of the election returns of the election of 1890 was made out before the election of 1892, and was used in that election, and has been paid for.

On the foregoing findings of fact the court decided as a conclusion of law :

"The services which form the cause of action in this suit not having been rendered at the proper time, to wit, before the Congressional election of 1890, and the defendants having, therefore, derived no benefit from them in that election, they must be deemed voluntary, and for them the claimant should not recover. Petition dismissed."

Petitioner thereupon appealed to this court.

*Mr. Charles H. Aldrich* and *Mr. Charles W. Needham* for appellant.

The legislation in Title 26 of the Revised Statutes was enacted to secure a fair election, at which all legal voters should be permitted to express their choice, illegal voting be prevented, and, as expressed in section 2018, " to the end that each candidate for the office of representative or delegate in Congress may obtain the benefit of every vote for him cast." To secure these objects supervisors of election were appointed, authorized and required to attend " at all times and places fixed for the registration of voters, who, being registered, would be entitled to vote for a representative or delegate in Congress," and when required by the chief supervisor, to make lists of such voters giving their residence and qualifications. These lists, made by the supervisors at the polling places, and places of registration, were returned to the chief supervisor to be preserved for future reference and use and became a part of the records of his office. The value of these records consisted largely in the fact that they could be used in subsequent elections in detecting illegal voters, in establishing, in a degree, the right of legal voters to cast their ballots for representatives in Congress, and also as evidence in prosecutions for illegal voting under the statute.

In *Dennison* v. *United States*, 25 C. Cl. 304, the principal item of the claim was for " entering and indexing the records of names of persons who were registered and who voted for Representatives in Congress in the several cities," etc. In the decision of that case the court allowed that item as a legal and proper charge for official service.

In *Allen* v. *United States*, 26 C. Cl. 445, the whole subject of the allowance for services of this kind by the chief supervisor was carefully discussed and allowed. The case of *Dennison* v. *United States*, in so far as it allowed the item referred to, was approved, and upon the subject of these records and charges, the court, in the *Allen case*, say: " When the books

or lists of the subordinate supervisors were returned to the chief supervisor they became the basis of a record in his office, and with them he had a right to deal, under said sections. . . . It may be," the court say, "that some of the information as to the voter might have been omitted consistent with the object and purpose of the statute; but there is no suspicion arising from the evidence in this case that the record was made unnecessarily prolix for the purpose of accumulating fees. It is difficult to understand how a record can be entered and indexed without spreading it at large upon some book of the office, and the fact that the services are to be paid for by the folio is an indication of substantial clerical work. . . . The officers entrusted with the execution of the law must be given some discretion in what they will embody in the lists, and so with the chief supervisor, when the papers reach his office he must be permitted to exercise his best judgment as to how they shall be entered and indexed, and if by the entry of the entire list the public convenience is subserved and the purpose of the statute accomplished, the law allows the compensation prescribed for the service."

In passing upon a similar account of this claimant for "entering and indexing" the records of the election of 1892, Judge William A. Woods, Circuit Judge of the Northern District of Illinois, said: "Item thirteen is for work done in 'entering and indexing' records in the manner described in the affidavit accompanying the account. Similar charges were presented for the years 1888 and 1890 and reference made to the ruling of the court thereon, that of 1888 having been disapproved by Judge Gresham, and that of 1890 having been approved (by myself) upon the authority of the Court of Claims in *Allen* v. *United States*, 26 C. Cl. 445. Reference is also made to the action of the United States Circuit Court for Indiana upon a like charge in the account for 1890 of Mr. Van Buren, the chief supervisor for that State. But, as is shown by the decisions of this court in *United States* v. *Jones*, 134 U. S. 483, and *United States* v. *Poinier*, 140 U. S. 160, the rulings and opinions of the Circuit or District Courts in passing upon accounts presented as this is, are not judicial or conclu-

sive, but constitute only *prima facie* evidence of the correctness of the accounts, and are subject to be reviewed and disregarded by the officers of the department in aid of which the courts are required to act. On the other hand, the decisions of the Court of Claims are made in formal cases or suits invoking judicial action, and consequently, unless appealed from, are conclusive and authoritative. By the decision in the cases mentioned, the charge in this account for entering and indexing is justified. It is, therefore, ordered that that item of the account be approved upon the authority of that decision."

The only reported opinion adverse to those above referred to is that of Judge Gresham rendered in passing upon the account in controversy.

We submit that there can be no question as to what constitutes the records of the office of the chief supervisor under this statute. His office is made the repository of these registers and lists returned by the supervisors of election. These are to be preserved, but they are temporary memoranda made by the supervisors at the polls and registering places. Considering the objects in view and the express statements in the statute, it is evident that the law contemplated that these records should be put in some permanent and convenient form for use in prosecutions for violation of the Elective Franchise Act, and in determining at subsequent elections who were, and who were not qualified voters. In this way legal voters have some official record of their having voted, and consequently of their right to vote at subsequent elections; illegal voters could be easily detected, and the candidate for Congressional representatives could "obtain the benefit of every vote for him cast."

This court in *United States v. Barber,* 140 U. S. 177, 178, said, in relation to the amount of charges made for drawing complaints: "It is evident that no iron rule can be laid down upon the subject, that something must be left to the discretion of the District Attorney and commissioner, and that if the complaints are not unnecessarily prolix their action should be sustained. This is a question of fact in all cases, and as the court

below has found not only in its formal approval of this account but in its opinion upon the demurrer that no unnecessary verbiage was employed and no surplusage to increase fees, we think the item should be allowed."

Applying this rule to the case at bar, it will clearly appear that the record kept by the claimant as chief supervisor was in every way justified.

*Mr. Assistant Attorney General Dodge* and *Mr. Samuel A. Putnam* for appellees.

Mr. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

The charge in question is claimed to be justified by Revised Statutes, §§ 2026 and 2031, the material parts of which read as follows :

" SEC. 2026. The chief supervisor shall prepare and furnish all necessary books, forms, blanks, and instructions for the use and direction of the supervisors of election in the several cities and towns in their respective districts. . . . He shall require of the supervisors of election, when necessary, lists of the persons who may register and vote, or either, in their respective election districts or voting precincts, and cause the names of those upon any such lists whose right to register or vote is honestly doubted to be verified by proper inquiry and examination at the respective places by them assigned as their residences; and he shall receive, preserve, and file . . . all certificates, returns, reports, and records of every kind and nature contemplated or made requisite by the provisions hereof, save where otherwise herein specially directed."

" SEC. 2031. There shall be allowed and paid to the chief supervisor, for his services as such officer, the following compensation, apart from and in excess of all fees allowed by law for the performance of any duty as Circuit Court commissioner : for filing and caring for every return, report, record, document, or other paper required to be filed by him under

any of the preceding provisions, ten cents; for affixing a seal to any paper, record, report, or instrument, twenty cents; for entering and indexing the records of his office, fifteen cents per folio. . . . And the fees of the chief supervisors shall be paid at the Treasury of the United States, such accounts to be made out, verified, examined, and certified as in the case of accounts of commissioners, save that the examination or certificate required may be made by either the Circuit or District Judge."

Under the first section, it is a matter for the chief supervisor to determine whether it be "necessary" to require of the supervisors of election lists of the persons who may register and vote, etc., and his discretion in this particular is not subject to review. When these lists are returned to him, he is required to "receive, preserve, and file" them as "certificates, returns, reports, or records," and by section 2031, "for filing and caring for" such "return, report, record, document, or other paper" he is entitled to ten cents. Is he, however, under the name of "entering and indexing the records of his office," entitled to fifteen cents per folio for making a complete copy of such returns, and arranging them in alphabetical order after they have been properly filed as records of his office?

The object of the statutes concerning the elective franchise, now embodied in Title XXVI of the Revised Statutes, was as declared in the title to the act of May 31, 1870, c. 114, 16 Stat. 140: "To enforce the rights of citizens of the United States to vote in the several States of this Union, and for other purposes," —among which was undoubtedly the preservation of the purity of elections, and the obtaining of an honest expression of opinion from each individual voter. For this purpose the judge of the Circuit Court was required, upon the petition of a certain number of citizens of any city or town having upwards of 20,000 inhabitants or of any county or parish in any Congressional district, making known their desire to have the registration or election guarded and scrutinized, to open the Circuit Court at the most convenient point in the circuit (§ 2011); to appoint and commission, from day to day, two citizens from each voting precinct, to be known and designated as supervis-

ors of elections, (§ 2012,) who were required to attend at the registration of the voters, to challenge voters and supervise the registry, to make lists of the voters when required, (§ 2016,) to attend at the election, to supervise the manner in which the voting was done, (§ 2017,) to canvass each ballot, and generally to see that the election and canvass were fairly conducted, and to make return of their doings to the chief supervisor (§ 2018). By § 2021, the marshal for the district was required, upon the application in writing of a certain number of citizens, to appoint a certain number of deputy marshals to aid and assist the supervisors in the verification of any lists of voters, and to attend the registration and election.

By § 2025, the Circuit Court was required to appoint, from among the Circuit Court commissioners, a chief supervisor, who should serve so long as he faithfully and capably discharged the duties imposed upon him.

From this brief recapitulation of the prominent provisions of the title, it is evident that no permanent system for the carrying on of Congressional elections was intended to be established. The act was to be operative only in particular cases, when upon petition filed by the required number of citizens the Circuit Court was authorized to appoint supervisors, who attended that election, at the conclusion of which they became *functi officio*. No system for the permanent registration of voters was contemplated, simply because the exigencies which dictated the appointment of supervisors for a particular election might not exist at the next or any subsequent election. No permanent official is provided for, except a chief supervisor in each judicial district, who served without regular salary and acted only when the electoral machinery was put in motion, prior to any election, by the petition of the requisite number of voters. No permanent records were contemplated, and without a system of registration like that obtaining in many of the States, none would be of any value, since persons who are disqualified at one election by reason of minority, alienage, non-residence, or other cause, might, when the next election took place, become legal and competent voters. So, those who are this year qualified may possibly,

either by removal from their present residence, by insanity, conviction of crime, or other cause, become disqualified the next year. The laws of the several States usually recognize the fact that a person, whose name appears upon the registry of a certain precinct, is presumed to be qualified at the next election in that precinct.. But even if a complete registration of voters were made by the chief supervisor, no such presumption would follow, since it is the State and not the general government which prescribes the qualification of voters. It was never the design of the act that Congress should determine who should vote at any election, or interfere with laws of the State in that regard, but only to protect those who were entitled to vote by the laws of the State in the exercise of the elective franchise. It would, therefore, have been entirely superfluous to provide for a permanent registry of voters to be kept by the chief supervisor. The state registration is presumed to answer all requirements in that particular.

So, too, a registry of voters, to be of any value, must be kept at the polling places in each precinct, in order that, as each voter presents himself, reference may instantly be made to the list to ascertain his qualifications. Hence the list made by the claimant, to serve any useful purpose, would have to be either printed or copied for use in each precinct — involving of course an enormous expense. But even this would have been of little value, since each precinct is concerned only with its own voters, and a list of 61,282 folios, containing the names of probably double that number of voters, would be so long as to be practically useless for ready and immediate reference. Add to this the fact that thousands of changes are made at each election, and that the services in question were not completed until July, 1892, nearly four years after the election took place, and it will be seen that the list made by the claimant could have been of no possible value to the government — of no more value than a city directory published four years after the compilation of names is made. The index, so prepared by him after the election of 1888, was not in fact made until after the Congressional election of 1890, and was never used until the election of 1892. To what

extent it was so used does not appear. It seems, too, that a similar index of the election returns of the election of 1890 was made out before the election of 1892, was used in that election, and has been paid for.

It is claimed, however, that if the statute requires or authorizes the work to be done, the claimant ought not to be held responsible for the fact that the transcript was of no value, or to lose his compensation for that reason. Assuming that section 2026 vests him with a discretion to require of the supervisors lists of the voters when in his opinion it is necessary, and that section 2031 authorizes and perhaps requires him to file and care for such lists, there is certainly no requirement that he make a copy of such lists. The entering and indexing the records of his office, for which he is entitled to recover 15 cents per folio, would evidently be complied with by his filing such returns, and indexing them in the name of the supervisor making the return; and even if the services performed by him in copying and rearranging the names upon these returns could be construed as "entering and indexing" them, it was a service of such manifestly disproportionate value to the cost thereby incurred, that we think it could never have been contemplated by the statute. The claimant should have recognized this fact, and before putting the government to the very large expense of this transcript, he should have been able to point to some statute requiring it to be done in language free from ambiguity.

The very magnitude of the expense incurred should have put the claimant upon inquiry as to the propriety of the service. He has no right to plunge the government into an expense of some $10,000 upon a doubtful interpretation of the law, especially when he is apprised of the fact that the service performed must have been of little or no value to the government. The index which he prepared for the election of 1890, and for which he was paid, covered every possible use for which the index he now charges for could have been made available. It is of no more value than a directory for a certain year issued after a directory for a subsequent year has been published and put upon the market.

We do not wish to be understood as imputing any bad faith to the plaintiff in this particular, as there are undoubtedly decisions, even of the Court of Claims, which uphold charges of this description, *Dennison* v. *United States*, 25 C. Cl. 304; *Allen* v. *United States*, 26 C. Cl. 445; and the department seems to have paid many of these accounts without question since these decisions. We are, however, clear in our opinion that the service is not one within the spirit or the letter of the statute; that the Circuit Judge was right in refusing to approve the account; and that the allowance of other accounts of a similar nature works no estoppel upon the government. If there be any estoppel at all it is against the claimant, who has already been paid for a similar service performed since the transcript in question was made.

The judgment of the Court of Claims is, therefore,

*Affirmed.*